UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| FACTORY MUTUAL INSURANCE COMPANY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 5:24-CV-17-REW-EBA |
| v. | ) ) | OPINION & ORDER |
| CIMCO REFRIGERATION, INC., | ) ) ) | |
| Defendant. | ) ) ) ) ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

In relation to a December 2022 fire at the J.M. Smucker Plant in Lexington, Kentucky, Plaintiffs Factory Mutual Insurance Company and The J.M. Smucker Company filed a civil complaint against Defendant CIMCO Refrigeration, Inc. Plaintiffs allege state negligence claims concerning Defendant's alleged role in the fire.

The Court addresses Defendant's motion for summary judgment, *see* DE 35, as well as *Daubert* motions filed by each side, *see* DE 33; 34; 36; 37; 38. All six matters are fully briefed and ripe for review. For the following reasons, and on the terms detailed, the Court **GRANTS** in part and **DENIES** in part DE 33; **GRANTS** DE 34; **DENIES** DE 36, 37, 38; and **GRANTS** in part and **DENIES** in part DE 35. A trial must solve the various merits questions under applicable law.

I.   **BACKGROUND**

a. **Factual Background**

The Court, given the Rule 56 context, takes the facts and record in Plaintiffs' favor: Plaintiff The J.M. Smucker Company ("Smucker" or "JMS") makes peanut butter at its

Lexington, Kentucky, plant ("Plant"). *See* DE 47-2 (Russell Declaration) at 3. To make the peanut butter, peanuts are roasted in large industrial roasters and milled into peanut butter. *See id.* The process requires cooling by a circulated brine solution that exchanges heat via refrigeration systems that use ammonia. *See id.* The Lexington Plant has two (2) ammonia refrigeration systems ("Chiller A" and "Chiller B") that cool the brine solution. *See id.* Defendant CIMCO Refrigeration, Inc. ("CIMCO") provided and installed Chiller A in 2020 and identical Chiller B in 2022. *See id.*

Chiller B is at issue here. Smucker officially started using Chiller B on March 30, 2022. *See id.* at 4. Thereafter, CIMCO performed quarterly and annual maintenance on Chillers A and B throughout 2022. *See id.* at 6. CIMCO also provided emergency service when the chillers experienced an operational problem or shut down. *See id.*

On December 18, 2022, Smucker contacted CIMCO regarding an alarm for high liquid level in Chiller B's accumulator. *See id.* at 7. CIMCO's typical service technician for this plant, Ricky Beckman, was sick, so CIMCO directed another technician, Vernest Byrd, to respond to the call. *See* DE 35-6 (Byrd Deposition) at 4; *see also* DE 47-10 (Sanders Report) at 6. Byrd arrived at the Plant that afternoon and worked on Chiller B until approximately midnight without success. *See* DE 35-6 at 5. This was Byrd's first time visiting the Plant. *See id.* at 6.

Byrd returned to the Plant the next morning and met with Smucker Utilities Technician Mat Baesler to discuss how to address the high level of liquid in Chiller B's accumulator. *See id.* at 5. Following their discussion, Byrd connected a hose between the Chiller B accumulator and the Chiller B receiver. *See* DE 35-1 at 3. He then tracked another hose from the Chiller B receiver into a bucket of water to vent ammonia. *See id.* at 3-4. This process—"burping" the system— effectively reduced the liquid levels in the accumulator after a couple of hours. *See id.* at 4.

During the "burping" process, one of Chiller B's valves had, inadvertently it seems, been left partially open, leading to an ammonia leak that triggered Smucker's ammonia reaction protocols of 150 parts per million ("ppm").  *See id.*; *see also* DE 47-1 at 2.  Byrd's and Baesler's personal ammonia meters alarmed, and Baesler discovered the issue and closed the valve.  *See* DE 35-1 at 4.  When the ammonia vapor concentration levels did not soon decrease below 150 ppm, Baesler spoke with Janice Anderson (Smucker's health, safety, and environmental coordinator) and Jennifer Russell (Smucker's plant engineer) and determined that a Plant-wide shelter-in-place order was necessary.  *See id.*  Emergency services were also called.  *See* DE 47-6 at 3.  Baesler activated the shelter-in-place order, leading Plant personnel to, by protocol, shut down their equipment and proceed to Building 15, the designated "safe haven" where all personnel assembled for a headcount.  *See* DE 35-8 (Anderson Deposition) at 7.  Pursuant to Smucker's protocol, the shelter-in-place leader ensured everyone was accounted for.  *See* DE 35-7 (Baesler Deposition) at 8.  Emergency services arrived.  *See* DE 57-6 (Russell Deposition) at 4.

Smucker housed and operated industrial peanut roasters.  Roasters 9 and 10, located in Building 7C, were "belt roasters."  *See* DE 35-1 at 5.  These conveyed peanuts on a belt through roasting sections.  *See* DE 35-9 (LeFevre Deposition) at 3.  Roaster 9 had been in the process of shutting down, as an unrelated reaction to a production issue, for approximately thirty minutes prior to the activation of the shelter-in-place alarm.  *See* DE 35-8 at 10-12;15.  The plant-wide shelter-in-place order led to an operator hitting an emergency stop on that Roaster, which interrupted the normal staged shutdown at the time.  *See id.* at 15.

During the shelter-in-place window, and prior to any "all-clear" on the ammonia issue, personnel observed smoke billowing from the building housing the Roasters.  It turns out that Roaster 9 had caught fire, and the ensuing fire ended up engulfing much of that building before

3

being contained by Lexington fire personnel.  A smoldering peanut evidently was to blame, leading to a fire that quickly got out of control.  *See* DE 58-1 at 2; DE 35-9 at 8.   The fire department was unable to put out the fire before the roaster and building were damaged.  *See* DE 35-7 at 7; DE 58-1 at 2.

In essence, JMS attributes the ammonia leak to negligence by CIMCO's employee Byrd, claiming Byrd (in a disputed fact) failed to properly close the leaking valve.  The ammonia leak begat the emergency evacuation, which caused a sudden Plant shutdown and the abandonment of processing equipment.  With no personnel present to give the roasters typical monitoring, the smoldering peanut caught fire, the fire quickly spread, and no timely fire suppression occurred to prevent the destructive ensuing conflagration.  Smucker (along with its insurance company FMIC, via a subrogation claim) seeks $8 million in compensation from CIMCO.

### b.  Procedural History

As a result of the fire, Factory Mutual and Smucker sued CIMCO in Fayette Circuit Court, alleging CIMCO performed its repair services on the industrial refrigeration system in a negligent manner, which caused the fire and resultant damages.  *See* DE 1-1 (Complaint) at 3-11.  Defendant subsequently removed the case to this Court based on diversity of citizenship under 28 U.S.C. § 1446.  *See* DE 1 (Notice of Removal).  Now before the Court is Defendant's motion for summary judgment.  *See* DE 35 (Motion); DE 35-1 (Memorandum in Support).  Plaintiffs responded in opposition, *see* DE 57 (Response), and Defendant replied, *see* DE 58 (Reply).  The Court also addresses five motions, launched bilaterally, to exclude expert testimony.  *See* DE 33; 34; 36; 37; 38.  All *Daubert* motions are fully briefed.  *See* DE  36; 41; 42; 43; 45; 46; 48; 51; 52; 53; 55.  All six motions are thus ripe for review.

## II.    *DAUBERT* MOTIONS

### a. Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert testimony[1] and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.

In *Daubert v. Merrell Dowell Pharm., Inc.*, 113 S. Ct. 2786 (1993), the Supreme Court "established a general gatekeeping . . . obligation for trial courts," requiring them "to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001)); *see also United States v. Mallory*, 902 F.3d 584, 592 (6th Cir. 2018) ("District courts are the 'gatekeep[ers]' of expert testimony." (alteration in original) (quoting *Daubert*, 113 S. Ct. at 2798)).

---

[1] "While state law controls the substance of [Plaintiffs'] claim[s], federal rules govern the procedure, 'including evidentiary rulings made pursuant to the Federal Rules of Evidence.'" *Finley v. Mora*, No. 22-1886, 2023 WL 7550447, at *2 (6th Cir. Nov. 14, 2023) (quoting *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)).

Under *Daubert*, "a district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176 (6th Cir. 2009) (quoting *Daubert*, 113 S. Ct. at 2799). "The inquiry is 'a flexible one,' and '[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (alterations in original) (quoting *Daubert*, 113 S. Ct. at 2797). However, the Sixth Circuit has enumerated several "red flags" that caution, situationally and when applicable, against accepting an expert, including "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id*. (citing *Best*, 563 F.3d at 177). The proponent of an expert opinion must establish admissibility by a preponderance of the evidence. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). The newest rule version codified the proof standard.

"Daubert sets out a 'flexible' and . . . lenient test that favors the admission of any scientifically valid expert testimony." *United States v. Bonds*, 12 F.3d 540, 565 (6th Cir. 1993); *see also Daubert*, 113 S. Ct. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Motions in limine act "to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). "As a general rule, a court should exclude evidence on a motion in limine only when that evidence is determined to be clearly inadmissible on all potential grounds." *Tucker v. Nelson*, 390 F. Supp. 3d 858, 861 (S.D. Ohio 2019) (internal quotation marks and citation omitted). "Such motions serve important gatekeeping functions by allowing the trial judge to eliminate from consideration evidence that should not be presented to the jury because it would

not be admissible for any purpose." *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 858 (W.D. Mich. 2008) (citation omitted). However, where the evidence is not clearly inadmissible, "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy[,] and potential prejudice can be resolved in the proper context." *Tucker*, 390 F. Supp. 3d at 861 (citation omitted). Courts generally should avoid excluding "broad categories of evidence." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). In such a case, the "better practice is to deal with questions of admissibility as they arise." *Id*.

As to the recent revisions to Rule 702, the Court sees little impact, beyond clarification, for a court properly applying the rule as previously phrased. This Court has long recognized the preponderance standard (from Rule 104(a)) on admissibility of opinion evidence, including for the three reliability-based requirements, and has not viewed reliability findings as a Rule 104(b) matter. The amendments are confirmatory.

### b. Steven A. Sanders

Defendant seeks to exclude Steven A. Sanders's testimony concluding that Vernest Byrd, Defendant's service technician, left valve AV42 open on Smucker's Chiller B, fatefully leaking the ammonia. *See* DE 33 (Motion); DE 33-1 (Memo in Support). Sanders is a licensed professional engineer with sixteen years of experience in the areas of design, construction, and failure analysis of HVAC (heating, ventilation, and air-conditioning), refrigeration, fire protection, building and industrial process piping systems, and equipment. *See* DE 33-9 (Sanders Report) at 3. Sanders produced an expert report in which he concluded that CIMCO failed to meet the standard of care reasonably expected of them in performing the task at hand. *See id*. at 14.

Defendant argues that Sanders's conclusion that Byrd, particularly, left the AV42 valve open "improperly ignores evidence contrary to Plaintiffs' position" and invades the province and

factfinding role of the jury. *See* DE 33-1 at 5, 7. Further, Defendant argues that Sanders's conclusion is directly at odds with the "Why-Why" document, the "Lessons Learned" document, and Byrd's deposition testimony, which purportedly indicate Baesler may have played a role in the open valve. *See id*. at 9. In allegedly ignoring contradictory evidence, Defendant claims that Sanders's testimony is tantamount to factfinding and making a credibility determination between Byrd, Baesler, and the investigatory documentation, functions reserved for the jury. *See id.* at 11. The Court addresses Sanders's alleged invasion of the province of the jury and alleged ignorance of contradictory evidence, in turn.

First, the purported invasion of the jury's role. Defendant expresses concern that Sanders's causation testimony may confuse the factfinder, "opining that 'all evidence' points to Mr. Byrd (instead of Mr. Baesler) leaving AV42 open is tantamount to performing the factfinding himself and relaying it to the jury, while improperly making a credibility determination between Byrd, Baesler, and the investigatory documentation." DE 33-1 at 11.

The general rule is "that expert witness testimony [should] not be used for the purpose of assessing another witness's credibility on non-technical or non-scientific points." *H.C. Smith Investments, L.L.C. v. Outboard Marine Corp.*, 181 F. Supp. 2d 746, 751 (W.D. Mich. 2002) (collecting cases). "At the same time, '[e]xperts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence.'" *Fulkerson v. Kirkpatrick*, No. 3:23-CV-520-RGJ, 2025 WL 2992557, at *5 (W.D. Ky. Oct. 24, 2025) (quoting *Richman v. Sheahan*, 415 F. Supp. 2d 929, 941 (N.D. Ill. 2006)).

In reaching his conclusion, Sanders considered the design and operation of Chiller B, the timeline of events (citing interchangeably to Byrd and Baesler's depositions), the specific mechanical components involved in the ammonia leak, and extensive documentation associated

8

with the event. *See* DE 33-9. Using his expertise in mechanical engineering and industrial ammonia refrigeration systems, Sanders deduced the manner of occurrence as described by Byrd and Baesler in their depositions to reach the opinion that Byrd left the AV42 valve open. Defendant points specifically to the following exchange in Sanders's deposition testimony:

> Q. Okay. Based on the materials and testimony here, can you rule out 100 percent that Mat Baesler left the valve open or did not leave the valve open, AV42?
>
> A. Can we rule that out. I'm sure, again, that's a possibility, but just like, hey, lightening [sic] striking is a possibility, but given all of the other evidence and testimony, I've not seen anything to indicate that Mr. Baesler did close or partially open valve AV42. All evidence is indicating that that was Mr. Byrd who had supposedly closed valve AV42, but it was found to be not fully closed.

*See* DE 33-1 at 10 (quoting DE 33-8 at 102). While Sanders does not make any statements speaking to the believability of Byrd over Baesler, he may not conclusively testify that Byrd failed to close the valve. That is a matter for the jury to determine, and Byrd himself denied responsibility. Certainly, in his testimony, Sanders may note, within his discussion of the event, parts of the record consistent with Byrd handling that particular valve and closure. However, opinion testimony that Byrd was the actor that failed to close the key valve simply is not proper—the jury will hear the proof and resolve that issue as a matter empirically disputed. This is what juries do. Accordingly, the Court excludes Sanders's testimony opining that Byrd was the actor responsible for failing to close the valve.

In excluding Sanders's testimony that Byrd alone failed to close the valve, the Court addresses Defendant's second argument—that Sanders ignored relevant evidence—to the fullest extent permitted within that limitation. Defendant highlights portions of Byrd's and Baesler's depositions, along with statements contained in investigation documents, that appear to conflict with Sanders's connection between Byrd's responsibilities and how those responsibilities translated to the nonclosure of the valve. The record indicates that Sanders reviewed the "Why-

9

Why" document, the "Lessons Learned" document, and Byrd's deposition testimony. *See* DE 33-9 at 10, 28. In reviewing the materials, Sanders necessarily considered Baesler's alleged role in the valve closure prior to drawing any conclusions about Byrd's responsibility as it related to the AV42 valve on Chiller B. Therefore, the "red flag" of "failure to consider other possible causes" is not present here. *See Newell*, 676 F.3d at 527 (citing *Best*, 563 F.3d at 177). However, this is a challenge "to the accuracy of the expert's conclusions, not to their reliability, and bear[s] on 'the weight of the evidence rather than on its admissibility.'" *Little Hocking Water Ass'n v. E.I. du Pont de Nemours & Co.*, 90 F. Supp. 3d 746, 757 (S.D. Ohio 2015) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008)); *see also United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis.").

Defendant cites *Ashland Hospital Corp. v. Affiliated FM Ins. Co.*, No. 11-16-DLB-EBA, 2013 WL 3213051, at *7 (E.D. Ky. June 24, 2013) for the notion that "selective disregard of [] contradictory evidence" warrants exclusion. *See* DE 33-1 at 9. Ironically, this reliance selectively disregards that this was but one factor in the court's ultimate conclusion that Lombardo, the expert in question, had failed to establish appropriate validation for his techniques or inferences and failed to reliably apply those inferences to the facts at hand. *See Ashland*, No. 11-16-DLB-EBA, 2013 WL 3213051, at *4. In analyzing Lombardo's inference that the temperature in the data center had not exceeded thirty-two degrees, the court observed that Lombardo's conclusion did not adequately explain four major pieces of evidence indicating that the data center had reached temperatures of around sixty-five to seventy degrees. *See id*. at 7. This differs from the present

10

case, where Sanders's report explicitly considers evidence that points to Baesler's possible responsibility for the open valve.

Second, even if Sanders had failed entirely to consider Baesler's alleged negligence as a cause of the open valve, as Defendant claims, that would not be a proper basis for exclusion of his expert opinion. While "failure to consider other possible causes" was one of the "red flags" identified by the Sixth Circuit in *Newell*, *see* 676 F.3d at 527, Defendant points to no case where a court barred expert proof on this basis alone. In fact, in *Best*, the first case cited in support of the *Newell* factors, the Circuit found that if the expert failed to consider a "likely cause," the opposing party would be able to attack the expert's opinion on that basis at trial. 563 F.3d at 181. Further, in *Brown v. Raymond Corp.*, 432 F.3d 640 (6th Cir. 2005), another case cited in *Newell*, the Sixth Circuit affirmed the district court's exclusion of expert testimony in a products liability case not based on failure to consider other possible causes, but, instead, based on "failure to present and test an alternative design." *Id*. at 647; *see also Dow v. Rheem Mfg. Co.*, 527 F. App'x 434, 437–38 (6th Cir. 2013) (citing the *Newell* factors but excluding expert testimony based only on failure to test).

Moreover, Courts have routinely found that expert opinions need not rule out alternative possible causes of injury to meet *Daubert's* reliability standard. *See, e.g., Jahn v. Equine Servs.*, 233 F.3d 382, 390 (6th Cir. 2000) (citing *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996)) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury."); *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 470 (6th Cir. 2004) (same); *Best*, 563 F.3d at 181 (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 266 (4th Cir. 1999)) ("[D]octors need not rule out every conceivable cause in order for their [ ] opinions to be admissible); *Sulak v. Am. Eurocopter Corp.*, No. 4:09-CV-651, 2012 WL

6567237, at *10 (N.D. Tex. Dec. 17, 2012) ("Merely because [the expert] discounted the causative effect of error during maintenance as a cause of the crash (which is Eurocopter's theory of causation) does not equate to his theory's being unreliable.").

This authority line confirms that the existence of other possible causes of injury typically "goes to the accuracy of the conclusion, not to the soundness of the methodology," and, therefore, only impacts the weight of the opinion, not its admissibility.  *Jahn*, 233 F.3d at 390; *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("[W]eaknesses in the factual basis of an expert witness'[s] opinion . . . bear on the weight of the evidence rather than on its admissibility."); *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (emphasis in original) ("[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the [factfinder's] consideration.").

Defendant's argument here is limited to the reliability of Sanders's causation opinion given his failure to credit or, in CIMCO's view, properly consider Defendant's theory of the case, that Baesler's negligence, at least his valve involvement, caused the leak.  Although the Court blocks the testimony as invading the jury's role, the alternative argument is not a proper basis for exclusion and would go only to the weight of Sanders's expert opinion, not its admissibility.  As the Sixth Circuit has readily noted:

> The *Daubert* standard is liberal, and it does not require expert opinions to be bulletproof. *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* Thus, as in all cases, a jury [here, fact-finder] is free to disbelieve expert testimony that it finds to be flawed.

12

*United States v. Lang*, 717 F. App'x 523, 534 (6th Cir. 2017) (quoting *Daubert*).  Thus, the Court only excludes the portions of Sanders's testimony that attribute valve closure conclusively to Byrd. The decision does not restrict the balance of his opinions.

### c.  Alejandro L. Jiminez

Defendant next seeks to exclude the portions of Alejandro L. Jiminez's proposed opinions regarding the cause of the subject fire.  As grounds, Defendant argues that Jiminez's proposed opinions were not timely disclosed, improperly bear on the legal issue of causation, and are inherently unreliable.  *See* DE 34 (Motion); DE 34-1 (Memo in Support).

Jiminez is a chemical engineer with fifteen years' experience in process safety and risk management, including specialty as those areas relate to fire safety and emergency response.  *See* DE 34-7 (Jiminez Report) at 5.  Plaintiffs employed Jiminez to rebut defense expert Trey Morrison's opinions concerning "the adequacy of Smucker's emergency response plans and how Smucker's response to the subject ammonia leak impacted the spread of the Fire."  *See* DE 45 at 4.  His report addresses "certain claims regarding Smucker's emergency response procedures and policies[.]"  *See* DE 34-7 at 5.

Defendant first notes that Jiminez's opinions as to any causal link, or "causal chains" as he labeled them at deposition, between the ammonia leak and the fire or its spread exceed the bounds of his written report and were not disclosed until his May 13, 2025, deposition.  *See* DE 34 -1 at 6. Defendant argues that as a result, Jiminez's causation opinions are untimely and violate Rule 26. *See id.* at 7-8.

Rule 26(a)(2) aims to ensure disclosure of "information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses."  FED.

R. CIV. P. 26(a)(2) cmt. to 1993 amendment.  In line with this directive, Rule 26(a)(2)(B)(i) requires that an expert's written report contain "a complete statement of all opinions the witness will express and the basis and reasons for them[.]"  The duty to supplement (one that relates to incomplete or incorrect information)  under Rule 26(e) "extends both to information included in the [retained expert's] report and to information given during the [retained] expert's deposition," and these supplementations must occur "by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  FED. R. CIV. P. 26(e)(2).

Defendant argues that Jiminez's deposition testimony signals an intention to testify as to the cause and origin of the fire and, perhaps, ammonia link, which is directly contrary to his report:

> This report reviews and responds to Exponent's opinions regarding the emergency action plan and related Standard Operating Procedures (SOPs) and policies. This report does not include opinions regarding the cause and origin of the roaster fire or ammonia leak.

See DE 34-1 at 3 (quoting DE 34-7 at 11).  In his deposition, Jiminez explains his intention to testify to the casual link between the ammonia leak and the absence of any Smucker personnel in Building 9 to extinguish the fire:

> Q. Well, Mr. Jiminez, you're very good at this. . . . but you're not going to testify at all at trial about the cause of the fire in the roaster, correct?
>
> A. Well, again, when I'm saying about the cause, I'm not going to testify when the fuel, or the first igniting fuel connected with—with the heat release and it started the flaming, but—but still, as I already said, there are some casual chains that cause at the end that fire that can be connected to the actual leak of ammonia.
>
> Q. And I understand that you're telling me that right now. What I'm asking you is do you plan to tell that to our jury because that's not in your report.
>
> A. I'm planning to say that to my—to the jury, yes.

See DE 34-8 at 7-8.  In response to Defendant's motion, Plaintiffs plainly state that, "Mr. Jiminez was never disclosed to testify on causation of the Fire, and he will not testify on causation of the Fire at trial."  See DE 45 at 4.  Plaintiffs instead characterize Jiminez's testimony as concerning

"the evacuation event's link in the causal chain at the end of the Fire, i.e., the spread of the Fire[,]" rather than the cause of the fire itself. *See id*. at 6.

Plaintiffs' argument overcomplicates (or understates) the discrepancy between Jiminez's written report and his explicit testimony. While it may be true that Jiminez's deposition testimony concerning the casual link between the ammonia leak and the absence of any Smucker personnel in Building 9 does not directly contradict the exclusionary statement in his report, *see* DE 34-7 at 11, it is equally true that the substance of this testimony is not included anywhere in his report. Jiminez's opinion as to causation or any fire-spread effects should have been included in his written report pursuant to Rule 26(a)(2)(B)(i). A scouring of the report shows nothing touching this area.

"If a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Determining if a failure was "substantially justified" is an objective inquiry that asks if the non-producing party acted reasonably, meaning that reasonable minds could differ regarding the appropriateness of the contested action. *Phillips v. Tricam Indus., Inc.*, No. 1:19-cv-00184, 2020 WL 1816468, at *4 (W.D. Mich. Feb. 20, 2020) (citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). In determining harmlessness, the Sixth Circuit considers five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Abrams v. Nucor Steel Marion, Inc.*, 694 F. App'x 974, 982 (6th Cir. 2017) (quoting *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015)). At bottom, a failure to comply with Rule 26(a) is harmless if it "involves an honest mistake on the part of a party coupled with sufficient knowledge

15

on the part of the other party." *Childress v. Bank of Am., N.A.*, No. 18-154-DLB-CJS, 2022 WL 184883, at *3 (E.D. Ky. Jan. 19, 2022) (citation and quotation marks omitted).

Here, the Court finds Plaintiffs' late disclosure of Jiminez's causation opinion not substantially justified and also, especially given its targeted rebuttal posture, prejudicial to Defendant. To begin, the non-compliant party bears the burden of proving that his noncompliance was substantially justified or harmless. *See Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003). Plaintiffs do not meaningfully endeavor to establish that their improper disclosure was substantially justified or harmless, and they thus necessarily fail to meet the burden.

Plaintiffs weakly contend that Jiminez disclosed the causal links in his Report. This is a futile effort. Though the Court will let Jiminez testify to what he disclosed in the Report, the deposition addition (far beyond the marginal elaboration allowed in the context of an expert's deposition) falls under the prohibition applicable to an unwarrantedly late and prejudicial new opinion. This follows from the interplay of Rules 26 and 37.

The Court grants the motion and excludes any testimony from Jiminez that a causal chain exists between the ammonia leak, the evacuation, and the scope or spread of the subject fire. He can take on Morrison and defend JMS's people-over-property approach, but he may not give opinions as to the relationship between the evacuation and the extent of the factory blaze.

### d. Andrew T. Clark

Defendant moves to exclude the testimony of Andrew T. Clark as unreliable under every gate of Rule 702 and *Daubert*. *See* DE 38 (Motion); 38-1 (Memo in Support).

At the time of the fire, Factory Mutual insured Smucker. *See* DE 1-1 at 4. Under its policy with Factory Mutual, Smucker had a deductible of $1,000,000. *See* DE 1 at 1. Following the fire,

Plaintiff Smucker retained Ankura, an independent advisory and forensic accounting firm, to evaluate Smucker's gross earnings loss as a result of the fire. *See* DE 41 at 3. Ankura calculated Smucker's damages to be $9,760,354.00. *See id*.

Plaintiff Factory Mutual retained Clark to examine Smucker's gross earnings loss claim resulting from the fire. *See id*. Clark has evaluated prior loss claims from Smucker and is "familiar with Smucker's production process and the company's accounting reporting practices." *See* DE 41-3 at 5. The applicable policy evidently imported the referenced loss theory. Eventually, Clark acted to give his same opinion on Smucker's (and its subrogee's) behalf in this litigation against CIMCO.

Clark prepared two reports: the first dated December 19, 2024, *see* DE 38-7, and the second (a rebuttal report) dated April 7, 2025, *see* DE 38-12. In reaching his opinions, Clark relied primarily upon four documents: "Peanut Butter Profit and Loss Statements (PB PL Requests_FY23.xlsx)," "Smucker Fiscal Year 2022 Equivalent Units Actual & Forecasts (FY22 Jif Brand Forecasts.xlsx)," "Smucker Fiscal Year 2023 Equivalent Units Actual & Forecasts (Jif Brand Forecasts.xlsx)," and "Ankura Claim (The J.M. Smucker Company—Preliminary Estimate of Loss 2023.04.17.xlsx)." *See* DE 38-7 at 1. He also reviewed an extensive list of documents attached as Exhibit 1 to his report. *See id*. at 9-10.[2] Clark analyzed this information because it was the same source material, from Smucker, that Ankura had access to in calculating its gross earnings loss measure. *See* DE 41-3 at 4. He ultimately calculated Smucker's damages, as to gross earnings loss, to be $6,405,063.00 as a result of the fire. *See id*. at 3. And CIMCO surely

---

[2] Exhibit 1 lists eighty (80) separate documents each grouped under the following categories: "Detailed Lexington P&L's," "EU's and Gross Sales by Item," "Expenses," "Lex Disaster Recovery Spend Invoices," "Peanut Butter Profit & Loss Statements," "Production," "Production through February," and "Utilities.

17

has a fulsome understanding of what Clark did, through the two reports, his deposition, and an affidavit supplied in the briefing.  CIMCO's own expert gave Clark's efforts a full autopsy.

The heart of Defendant's attack on Clark is his reliance solely on costs, figures, forecasts, and information provided to him by Ankura, Factory Mutual, or Smucker.  *See* DE 38.  Generally, an expert's reliance on assumptions, if typically foundational in the field, "go to the weight, not the admissibility, of the testimony."  *SNMP Rsch., Inc. v. Extreme Networks, Inc.*, No. 3:20-CV-451-CEA-DCP, 2025 WL 1524476, at *6 (E.D. Tenn. May 28, 2025) (quoting *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015)).  The Sixth Circuit has stated, "Where an expert bases [his] opinion on assumed facts, 'mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'"  *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1224 (6th Cir. 2025) (quoting *In re Scrap Metal*, 527 F.3d at 530) (ellipses in original).  "[I]t is up to opposing counsel to inquire into the expert's factual basis."  *L.E. Cooke Co.*, 991 F.2d at 342 (citation omitted).

In arguing Clark's opinions are unreliable, Defendant leans heavily on *Endless River Technologies, LLC v. TransUnion, LLC,* No. 23-3087, 2025 WL 233659 (6th Cir. Jan. 17, 2025).  Defendant argues that *Endless River* requires the exclusion of Clark's testimony because he adopted Smucker's original and revised forecasts without independently evaluating or verifying the feasibility of the projections.  *See* DE 38-1 at 22-23.

Although Clark used data and information internally developed by Smucker, he also personally reviewed that information to ensure its accuracy.  *See* DE 38-9 at 17 (Clark testifying that he ensured the reliability of the data by "verif[ying] the information, the source documentation provided against itself, against other forms of the same documentation, also with the claim that Ankura presented under the same standards quite frankly").  This differs from *Endless River,*

18

where the plaintiff's expert's opinion on damages constituted a "'wholesale adoption' of [plaintiff's] profit projection without 'apparently even evaluating the bases for those estimates.'" *See Endless River*, 2025 WL 233659, at *8 (quoting *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014)).  Indeed, here, Clark explained the utility of the data and his use of a "top-down" methodology to "see what [the] insured (in this case, Smucker) would have earned in net profit but for a loss (in this case, the fire)."  *See* DE 41-3 at 3.  Clark noted his review of Smucker's daily production records and cited Smucker's total suspension of production from December 19, 2022, to December 26, 2022.  *See id.* at 5.  From December 27, 2022, through the end of January 2023, Smucker experienced lower production due to the fire.  *See id.*  Clark began the assessment of lost profits at the time of the fire, and he concluded in April 2023 given that "[i]n April 2023 and after, there was no visible sales shortfall."  *See* DE 41-3 at 5-6.  In his affidavit, Clark testified that his reliance on Smucker's own documentation is deemed an acceptable practice by the American Institute of Certified Public Accountants ("AICPA").  *See id.* at 6-7.  Clark's crosschecking of the data, paired with his explanation of its utility in calculating the appropriate damages, defeats Defendant's argument that the report lacks reliability simply because it rests upon information provided by Smucker.  *See Mareiners, LLC v. Anomatic Corporation*, No. 2:22-CV-3433, 2025 WL 4480365, at *5 (S.D. Ohio Dec. 30, 2025) (citing *Endless River*, 2025 WL 233659, at *8) (permitting expert's damages opinion where the expert "verified the feasibility of the projections and evaluated their bases by cross-checking them against: (1) research and analysis from well-respected organizations in the industry"); *see also CIT Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677–78 (S.D.N.Y. 2011) (holding expert's lost profits opinion inadmissible because it was "based on conclusory statements of the expert's client" regarding deals that were never finalized, but

allowing expert testimony about lost profits that was based on actual revenues received and costs incurred).

The Court concludes that Clark's testimony passes the *Daubert* reliability threshold. He opines based on his analysis and interpretation of a contested factual record. On cross-examination and as a part of its case, Defendant can dispute, present hypotheticals, and generally erode Clark's factual predicates or suppositions. The jury will know that Clark is giving opinions with particular foundations. The Court will take care to keep Clark within the proper boundaries, and the jury will be told its right to reject any of Clark's opinions.

Defendant next argues that Clark's expert report fails to comply with Rule 26(a)(2) because it fails to contain the "how" and "why" underlying his conclusions. *See* DE 38-10 at 19 n.10. Rule 26 requires a party to disclose the identity of the expert and provide the other parties with a written report prepared and signed by the expert. FED. R. CIV. P. 26(a)(2). The Rule requires the report to contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the data or other information considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous ten years;
> (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

FED. R. CIV. P. 26(a)(2)(B). As noted by the commentary, the requirements of paragraph (2)(B) were added because "[t]he information disclosed under the former rule in answering interrogatories about the 'substance' of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness." FED. R. CIV. P. 26(a)(2)(B) Advisory Committee Notes to the

1993 Amendments.  By amending the Rule, the Advisory Committee hoped that the detailed reports required by paragraph (2)(B) would allow parties to effectively prepare for or possibly avoid deposition of expert witnesses.  *Id.*  ("Since depositions of experts required to prepare a written report may be taken only after the report has been served, the length of the deposition of such experts should be reduced, and in many cases the report may eliminate the need for a deposition.").

In attacking Clark's conclusions contained in his report, Defendant argues that the report fails to comply with Rule 26(a)(2)(B)(i)'s requirement for "a complete statement of all opinions the witness will express and the basis and reasons for them."  Defendant claims that Clark's report merely contains various figures and charts with no explanation.  This is patently false.  The first four pages of Clark's report detail the bases for his gross earnings loss measurement and explain the charts in the subsequent pages.  *See* DE 38-7 at 1-4.  The Court finds, on this record, Plaintiffs' disclosures as to Clark appropriate.

A few additional notes on the Clark opinions and the Rule 702 checkpoints.  Clark began the journey in a posture where Smucker and FMIC were on opposite claim sides.  The Ankura analysis, available to all parties here, represented one credentialed view of the loss under the applicable policy.  *See* DE 41-2 at 2-3.  Clark walks much the same empirical path (from the GAAP-based records of a public company), but he distinguishes the Ankura treatment as overstating the loss.  *See* DE 38-7 at 3; DE 41-3 at 5.  As a matter of comparative analysis, these steps contributed logically to the opinions rendered then (the same ones rendered now) in the context of Smucker's claim against CIMCO.

Clark is not merely parroting JMS's stated loss theory or JMS's unchecked data.  Indeed, Clark repeatedly cites the longitudinal validity of the EU prior-month forecasts as almost

21

completely accurate, at "100.34% of actual EU sold." *See id*. at 2. Additionally, the actual sales data from the period confirm a year-over-year drop that appears reasonably confirmatory on the lower forecasts for the so-called "loss affected period."

Further, Clark's chosen theory surely would not be the only candidate, as the Ankura various analyses show, but Clark defended his approach as best measuring the loss resulting from the fire and its interruption of the Plant's operations and continuity. The Court agrees that Clark relies on a December 2022 forecast that he also criticizes, but that forecast provides the needed apples-to-apples data for a change in the forecast measure. A loss claim of this type requires damage proof of reasonable certainty, and the jury must assess Clark's methodologically reasonable approach from that standpoint.

As to granular criticisms, all of the Kniepmann points land in one way or another. The EU calculation is not one Clark directly recites in his main report, but Kniepmann obviously diagnosed the model and indeed founded criticism (including disputed math errors) on the derivation. Further, Clark's opinions have vulnerability on the "loss affected period," given that JMS-FMIC seem, initially at least, to have designated the time to be studied. The jury will hear that, but Clark further opined that his study confirmed, that the numbers told him, the loss ended with the first calendar quarter of 2023. *See* DE 41-3 ¶ 25. The factfinder will hear from Kniepmann regarding what Clark did and did not consider. But in the Court's view, Plaintiffs have preponderantly shown that Clark, a CPA that recognized and applied the governing professional standards in a manner he has repeatedly done in like contexts over his career, relied on adequate information and analyzed it through a proper method reliably applied in this case. A "perfect expression" is not what the Rule requires. Rule 702 Advisory Committee Notes to 2023 Amendments.

### e. Clay M. Kniepmann

Similar to Defendant's motion to exclude the testimony of Andrew T. Clark, Plaintiffs move to exclude or limit the testimony of Clay M. Kniepmann. Plaintiffs claim that Kniepmann's expert report does not sufficiently state the bases or reasoning for the findings in his report as required by Rule 26(a)(2)(B), and that he is not qualified to opine on the particular subject matter of the case. *See* DE 36 (Motion); 36-1 (Memo in Support). The Court rejects these arguments.

On March 10, 2025, Defendant disclosed Kniepmann as an expert and noted that he would testify consistently with his report. *See* DE 36-5 (Defendant Expert Disclosure). Defendant retained Kniepmann to review the expert report prepared by Clark on behalf of Plaintiffs. *See* DE 36-6 (Kniepmann Report). Plaintiffs argue that Kniepmann's report falls short of compliance with Rule 26(a)(2)(B) given that it reaches no independent damages conclusion and merely states that the "Clark Report lacks sufficient description of and support for a number of key inputs and figures," and "the Clark Report does not address any mitigating factors or alternative explanations of the EU sales shortfall, and simply attributes all of the reduced EU sales forecast to the alleged damage event." *See* DE 36-1 at 9-10.

In defining the proper scope of rebuttal expert testimony, courts, in one formulation, have held that rebuttal evidence "identifies a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise." *Branche v. Zimmer, Inc.*, No. 3:06-CV-234, 2009 WL 8750012, at *8 (E.D. Tenn. Mar. 9, 2009) (quoting *Sci. Components Corp. v. Sirenza Microdevices, Inc.,* No. 03 CV 1851(NGG)(RML), 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008)); *see also* FED. R. CIV. P. 26(a)(2)(C)(ii) (defining a rebuttal report as one "intended solely to contradict or rebut evidence on the same subject matter identified by another party"). Indeed, Kniepmann's report, by its nature and content, is "intended solely to contradict or rebut evidence

on the same subject matter identified by another party's expert." *Hampton v. Bob Evans Transp. Co.*, 6:18-143-DCR, 2019 WL 1521976, at *2 (E.D. Ky. Apr. 8, 2019) (quoting FED. R. CIV. P. 26(a)(2)(D)(ii)) (internal quotation marks omitted).  Kniepmann may offer his rebuttal opinions "highlighting the flaws in and limitations of [Clark's] work, which are crucial to the jury's ability to assess the weight of [Clark's] opinions." *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 588 (E.D. Mich. 2022).  In essence, Kniepmann's report critiques Clark's gross earnings loss calculation methodology.  *See* DE 36-6 at 4-5.  He explains that Clark's report presents a logical inconsistency when the report simultaneously criticized the Ankura report's reliance on Smucker's December 2022 sales forecast in calculating the alleged loss during January 2023 through March 2023 while also relying on that same data for "nearly the same purpose in his calculation, comparing the projections in the December 2022 forecast to the updated January 2023, February 2023, and March 2023 forecast figures to determine EU Sales Shortfall." *See id*. at 5.  Kniepmann thereafter continues to break down purported errors or decry lacunae in Clark's report, including assumptions in the sales value per EU, incomplete labor and electricity savings calculations, insufficient descriptions of calculation elements, unjustified loss period conclusions, and the failure to consider alternative explanations for the reduction in sales at the Smucker Plant.  *See* DE 36-6 at 5-12.

Kniepmann, properly credentialed and experienced, provides thorough analyses and discussion for his criticisms of the Clark Report, all founded on the record.  Accordingly, his opinions are based on sufficient facts and data.  As for Plaintiffs' argument that Kniepmann's report falls short of compliance with Rule 26(a)(2)(B) because it reaches no independent damages conclusion, the Court sees no such requirement given the report's intended rebuttal purpose.  *See Shupe v. Rocket Companies, Inc.*, 752 F. Supp. 3d 689, 730 (E.D. Mich. 2024) (refusing to exclude

24

expert's rebuttal opinion that only criticized plaintiffs' expert's damages methodology and did not develop an independent damages methodology).

Plaintiffs next argue that Kniepmann is not qualified to render an opinion on gross earnings loss measurement because he has never given an expert opinion on that specific matter and the majority of his background relates to fraud investigations. *See* DE 36-1 at 11-12. While the qualification requirement is "treated liberally," that "does not mean that a witness is an expert simply because he claims to be." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citation omitted). An expert must be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 209 (6th Cir. 2015) (citing *United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012)). "Experts need not even have direct experience with the precise subject matter or product at issue." *Ashland Hosp. Corp.*, No. 11-16-DLB-EBA, 2013 WL 3213051, at *2 (citing *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502 (6th Cir. 2006)).

On this record, the Court is satisfied that Kniepmann is qualified to opine on damages (well, criticism of Clark's processing of damages) in this action based on his knowledge, skill, experience, training, and education. FED. R. EVID. 702. He is a certified public accountant and fraud examiner. *See* DE 36-6 at 15. He is certified in financial forensics and business valuation. *See id.* Kniepmann's testimony that he had never rendered an expert opinion on a gross earnings loss measure is not disqualifying. *See Ashland Hosp. Corp.*, No. 11-16-DLB-EBA, 2013 WL 3213051, at *2. Even if direct experience with the precise subject matter were necessary, Kniepmann testified that he had previously worked on "dozens, if not hundreds" of cases involving loss

25

valuation in the context of an insurance claim. *See* DE 46-1 at 7. Moreover, he characterized Clark's report as a lost profits analysis and pushed back on Clark's use of the term "gross earnings loss measurement." *See id.* When asked whether he viewed a lost profit analysis and the gross earnings loss measurement as the same thing, he noted,

> They're substantially similar. So the gross earnings loss measurement, that's what a lot of insurance companies refer to in their policy.
>
> Generally, in the litigation space, in the common parlance it's going to be viewed as a lost profits analysis. And they're almost the exact same thing, save for if there is anything in that insurance policy that is specific to that policy that might alter it slightly.

*See id.*

Perhaps Plaintiffs can weaken Kniepmann over his particular experience, as Clark repeatedly suggests. *See* DE 38-12 at 7 (calling it "alarmingly clear" that Kniepmann has "lack of experience with gross earnings claims"). That said, the Court views the Kniepmann opinions as legitimate for the factfinder to hear in assessing whether Clark got it right in whole or in part. Kniepmann is sufficiently qualified to rebut Clark's gross earnings loss measurement. Plaintiffs can cross-examine Kniepmann on his particular background; that, here, is a weight matter.

### f. Delmar "Trey" Morrison

Plaintiffs next seek to exclude or limit Delmar "Trey" Morrison's testimony. *See* DE 37 (Motion). As grounds, Plaintiffs argue that Morrison is not qualified to testify or offer his opinions regarding the ammonia leak, Smucker's emergency response to the ammonia leak, or shelter-in-place procedures or fire mitigation procedures in a shelter-in-place. *See* DE 37-1 (Memo in Support) at 6-11. Plaintiffs further allege that Morrison's opinions regarding the ammonia leak and Smucker's emergency response are unreliable and ill-founded. *See id.* at 11-15.

Morrison holds a B.A. in Chemistry from Knox College, an M.S. in Chemical Engineering from Oklahoma State University, and a Ph.D. in Chemical Engineering from the Illinois Institute

26

of Technology.  *See* DE 37-5 (Morrison Report) at 10.  He is a principal engineer in the Thermal Sciences Practice at Exponent and specializes in the scientific investigation and prevention of catastrophic fires, explosions, and chemical process incidents.  *See id*.

Defendant retained Morrison to investigate the ammonia leak, shelter-in-place activity, and December 19, 2022, fire incident.  *See id*. at 9.  Plaintiffs argue that Morrison is not qualified to offer any opinions concerning the incident at issue given his concession in deposition testimony that he could not recall "investigating a past incident involving the same features of this case, where an ammonia leak occurred at a facility, which led to a shelter-in-place event and a fire occurred in a different part of the facility while the shelter-in-place is active."  *See* DE 37-1 at 8. Further, Plaintiffs note that Morrison has not published any scholarship addressing a shelter-in-place resulting from an ammonia leak, prepared an emergency response plan, or prepared an ammonia reaction document.  *See id.* at 9.

These qualification arguments do not persuade.  As noted above, typically "[e]xperts need not even have direct experience with the precise subject matter or product at issue."  *Ashland Hosp. Corp.*, No. 11-16-DLB-EBA, 2013 WL 3213051, at *2 (citing *Planned Parenthood Cincinnati Region*, 444 F.3d at 502).  This case fairly involves the application of general safety principles to the particulars of a plant event.  Morrison has over twenty-five (25) years of industrial experience working in fire, explosion, and chemical process safety.  *See* DE 37-5 at 10.  He has "performed hundreds of hazard and risk analyses and investigations involving fires, explosions, or chemical releases[,]" and "evaluated emergency action plans, accidental toxic gas release impacts, and emergency evacuations."  *See id*.  The Court considers a proposed expert's "full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area."  *Brooks v. Caterpillar Glob. Mining Am., LLC*, No.

4:14-CV-00022-JHM, 2016 WL 276126, at *3 (W.D. Ky. Jan. 21, 2016) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).  Morrison's report targets Smucker's alleged lack of protocol and procedure for mitigating the risk fires in roasters present during a shelter-in-place emergency and evacuation.  *See* DE 37-5 at 11.  The Court is satisfied that Morrison's expertise in fire, explosion, and chemical process safety, paired with his experience in evaluating emergency action plans, qualifies him to testify on these matters.  The lack of a granular match between Morrison's field experience and the details of this event simply is a possible line of cross-examination, not a reason to invalidate Morrison's conclusions from a career of studying and responding to comparable scenarios.  Same for any lack of authored literature and drafted plans—he may not have engaged in those particular undertakings, but his wealth of experience in the pertinent field supplies a sufficient experience-based fund of information on which he has grounded his opinions in this case.

Plaintiffs next argue that Morrison's testimony should be excluded on reliability grounds. *See* DE 37-5 at 12.  Specifically, Plaintiffs allege that Morrison's opinions concerning Smucker's ammonia leak response and emergency response are not based on sufficient facts or data because Morrison did not review, it seems was not even aware of, Smucker's ammonia leak response plan or Smucker's emergency response plan in forming his opinions.  *See id*. at 12-15.

Morrison conducted an onsite visit on February 27, 2025, to examine Roaster 9, the Chiller B mechanical room, and Building 15 (the designated shelter-in-place safe haven).  *See* DE 37-5 at 9.  He developed seven (7) opinions "based on [his] education, experience, and training coupled with the deposition testimony, the fire department's incident report, Smucker SOPs and Multi-Cause Analyses (MCAs), equipment drawings and other documents from the discovery file, and

28

facts [he] gathered during . . . inspection of the Smucker facility[.]" *See id.* at 9, 11. Morrison

included these opinions in his report as follows:

> **Opinion 1:** The ammonia leak which occurred during CIMCO's service of Chiller B in building 9 did not cause the fire in Building 7C, which was hundreds of feet away.
>
> **Opinion 2:** Due to Smucker's lack of documentation, neither the point of origin nor the cause of the fire can be directly identified. However, the area of origin of the fire was in Roaster 9, and the cause of the fire was most likely related to Smucker's maintenance and operation of the roaster.
>
> **Opinion 3:** Due to Smucker's refusal to share its records of contemporaneous Roaster 9 data, including temperature and carbon monoxide concentration data in the roaster on the day of the incident, the timing of ignition cannot be determined. I cannot rule out a pre-existing or incipient fire that would be observable by a roaster technician preceding the shelter-in-place event.
>
> **Opinion 4:** Despite Smucker's knowledge that its peanut roasters posed an inherently high fire risk, Smucker's shelter-in-place decisions did not address the risk of initiating a roaster E-Stop with hot material inside and leaving this equipment unattended and without remote monitoring or control capability.
>
> **Opinion 5:** It was Smucker's responsibility, not CIMCO's, to mitigate the risk of a fire in the roasters, even during a shelter-in-place event.
>
> **Opinion 6:** Despite Smucker's knowledge that Roaster 9 was experiencing combustible peanut meal build-up and mechanical issues throughout the 24 hours leading up to the incident, Smucker failed to prioritize the prevention of a fire within Roaster 9 during the shelter-in-place event.
>
> **Opinion 7:** Smucker failed to practice its emergency response plan in a realistic manner, which contributed to its disregard of fire hazards that could exist during a real shelter-in-place event.

*See id.* at 11. Plaintiffs specifically seek exclusion of Morrison's Opinions 4, 5, 6, and 7. *See* DE

37-1 at 15.

Plaintiffs' argument hinges on Morrison's failure to review Smucker's ammonia leak

response plan or Smucker's emergency response plan. The ammonia leak response plan (entitled

"SOP-8045") "[d]efine[s] the response procedure to respond to a suspected ammonia release." *See*

DE 44-2 at 2. The cited emergency response plan (entitled "Plan Number: ESF 10-D-19 J.M.

Smucker Co.") outlines various procedures in the event of a hazardous chemical release. *See* DE

44-1. The document identifies potential sources of hazardous chemical releases, the facilities

29

likely to be impacted, protective actions to be taken, and containment protocols. *See id.* Defendant counters that review of these documents was not necessary given their lack of information specific to peanut roasters. *See* DE 43 at 11.

The Court agrees with Defendant. While Morrison did not review these documents, the Court does not perceive them as required considerations in reaching Morrison's conclusions. Morrison's ignorance of the particular documents is pertinent to impeachment but not fatal to admissibility of his views; he did understand, through deposition proof, the JMS reaction to the leak and its shelter-in-place approach. Further, when asked whether Plaintiff Smucker's had any protocols in place "in the event of a shelter-in-place alarm or an evacuation alarm to reduce or eliminate the risk of a smolder or a fire in the roasters[,]" Janice Anderson, corporate representative for Smucker's, conceded that there were not such particular protocols. *See* DE 35-8 at 12-13. Morrison reviewed Anderson's deposition prior to drafting his report. *See* DE 37-5 at 67. Furthermore, Morrison's opinions do not directly address Smucker's procedures for preventing a hazardous chemical release or its procedures for preventing harm to human health in the event of such release.

Morrison's failure to review these documents is fodder for cross examination, but not an exclusion basis. "[M]ere weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than on its admissibility." *McLean*, 224 F.3d at 800–01 (internal quotation marks and citations omitted). "[A]rguments related to 'contrary evidence' or 'incompleteness' also go to the weight of the evidence rather than its admissibility and are properly rejected at this juncture." *Thomas v. Lambert*, 606 F. Supp. 3d 592, 603 (E.D. Mich. 2022) (citing *Lang*, 717 F. App'x at 536 ("Although Rule 702 does not require an expert to consider all the facts and data available, it does require the factual basis of his opinion to be sufficient.")); *see also*

30

*Daubert*, at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citation omitted)); *Whirlpool Props. v. LG Elecs. U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at *4 (W.D. Mich. Jan. 10, 2006) ("Selection of an inappropriate universe generally affects the weight of the resulting data, not its admissibility.") (citation omitted). As a result, Plaintiffs' argument "fundamentally confuses the credibility and accuracy of [the expert's] opinion with its reliability." *In re Scrap.*, 527 F.3d at 529 (further noting that "[t]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.") (citing FED. R. EVID. 702). Accordingly, Morrison's opinions are based on sufficient facts or data.

## III.  SUMMARY JUDGMENT

### a.  Standard of Review

Under Rule 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether a genuine dispute exists, the Court considers all facts and draws all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Avantax Wealth Mgmt., Inc. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407, 414 (6th Cir. 2024) (citing *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011)). Furthermore, the Court may not "weigh evidence [or] determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to produce "specific facts showing that there is a genuine issue for trial." *Id.* "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Id.* at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical. *See Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 88 S. Ct. 1575 (1968)). Such evidence must be suitable for admission into evidence at trial. *See Salt Lick Bancorp v. Fed. Deposit Ins. Corp.*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

Sitting in diversity jurisdiction, the Court looks to federal law to resolve procedural issues, and Kentucky law, as the forum state, to resolve substantive ones. *See Hanna v. Plumer*, 85 S. Ct. 1136, 1141 (1965); *Erie R.R. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938).[3]

---

[3] The parties have proceeded on the assumption that substantive Kentucky law governs this case. This matter is before the Court on the basis of diversity jurisdiction, and thus the substantive law of this state typically would apply. *See Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003) ("For purposes of diversity jurisdiction, a federal court is in effect another court of the forum state, in this case Kentucky, and must therefore apply the substantive law of that state.") (citing *Jandro v. Ohio Edison Co.*, 167 F.3d 309, 313 (6th Cir. 1999)). The parties do not engage in a choice-of-law analysis; the Court proceeds under the law of the Commonwealth, which typically favors application of its own law.

**b. Analysis**

CIMCO sets forth three primary arguments in its motion for summary judgment: (1) The contractual terms between Smucker and CIMCO foreclose Smucker's claims; (2) CIMCO, factually and proximately, did not cause the fire or resultant loss; and (3) Plaintiffs' negligence per se claim fails under Kentucky law as outside the scope of that permitted by KRS § 446.070.

**i. Governing Contract**

In support of its foreclosure argument, CIMCO cites exculpatory language from its initial Chiller B proposal noting that CIMCO is not "liable for any losses, injuries, expenses or damages whether direct, indirect, special, incidental, consequential, or punitive, arising out of the goods, or the installation, operation, or failure of operation of the goods or related systems even if caused by [CIMCO's] negligence." *See* DE 35-1 at 8 (citing DE 35-2 at 9). Plaintiffs counter that Purchase Order PO-143323, which contains no such clause, is the operative contract governing Smucker's purchase of Chiller B from CIMCO. *See* DE 47-1 at 5.

"The construction as well as the meaning of a written instrument, however compiled, is a matter of law for the court." *Morganfield Nat. Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992). Generally, "a seller's quote is not an offer, but instead an invitation for the buyer to make an offer, usually through a purchase agreement." *BorgWarner PDS Irapuato S. de R.L. de C.V. v. Parker Hannifin Corp.*, No. 23-3204, 2025 WL 1433918, at *5 (6th Cir. May 19, 2025) (citing *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999)) (applying Ohio's version of the UCC). "But that's not always true. A quote can be an offer if it's reasonably apparent 'from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract.'" *See id.* (quoting *Dyno*, 198 F.3d at 572). At bottom, whether a quote equates to an offer is "an intent question: whether the party providing the quote (usually the seller) intended it

33

to create a binding contract that the buyer could consummate merely by accepting, or if the seller intended the quote to serve as an invitation to negotiate." *See id.* (citing *Dyno*, 198 F.3d at 572).

On January 21, 2021, CIMCO submitted a "proposal" to Smucker concerning Chiller B ("Proposal"). *See* DE 35-2. The proposal was only for the sale of the Chiller and expressly did not include installation. On March 12, 2021, Smucker issued Purchase Order PO-143323 for $559,388.00 to CIMCO for the installation of Chiller B. *See* DE 47-2 at 13. No Smucker employee or representative signed the CIMCO proposal. *See id.* at 8. The Smucker purchase orders incorporate by reference Smucker's linked Purchase Order Terms and Conditions. *See id.*

CIMCO claims the terms contained in the Proposal govern, thus exculpating it for future negligence liability; Plaintiffs contend the terms incorporated by reference in Purchase Order PO-143323 govern. The parties dispute whether CIMCO's January 2021 Proposal was a valid offer.

The Sixth Circuit analyzed offers in the price quotation-purchase order context in *BorgWarner PDS Irapuato S. de R.L. de C.V. v. Parker Hannifin Corporation*. There, BorgWarner, an automotive supplier, sought an agreement to buy bonded pistons from Parker. No. 23-3204, 2025 WL 1433918, at *1. Parker sent BorgWarner a quotation with descriptions of the desired parts, pricing based on BorgWarner's estimated annual use, minimum quantities, tooling costs, and payment information. *See id.* The bottom of the quote said that the "[q]uotation is tentative and subject to change pending entire review of purchase order and any additional specific requirements not presented in RFQ package at time of quotation." *See id.* It also noted that the quote was valid for 60 days but referred to the "Seller's Offer of Sale" for Parker's full terms. *See id.* Approximately two months later, BorgWarner issued a purchase order referencing its own terms and requesting the parts described in the quotation. *See id.* at *2. Parker responded, acknowledging that BorgWarner's purchase order was "received and processed," while also

34

informing BorgWarner to "see attached quote and Parker Terms and Conditions." *See id*. Despite the differences in the terms exchanged, BorgWarner and Parker continued performance on this quote/purchase order/release/acknowledgment cycle. *See id*. BorgWarner eventually sued Parker for breach of contract when Parker attempted to unilaterally impose a price increase. *See id*. at *4.

In analyzing whether Parker intended to create a binding contract, via its initial quotation that BorgWarner could consummate merely by acceptance, the Circuit looked at the definiteness of the quotation's terms and the words and circumstances surrounding its exchange. *See id*. at *6 (citing *MLMC, Ltd. v. Airtouch Commc'ns, Inc.*, 215 F. Supp. 2d 464, 477 (D. Del. 2002)). Although the quotation contained detailed descriptions and pricing information, its terms also indicated that further assent by Parker—not merely BorgWarner's acceptance—was required before a contract would exist. *See id*. at *7. Importantly, the quotation expressly stated that it was "tentative" and "subject to change pending entire review of [the] purchase order," and the prices were calculated using estimated annual usage and minimum quantities, which the Circuit viewed as approximations rather than firm commitments. *See id*. These features signaled that Parker retained the ability to review and reconsider or modify the terms after receiving a purchase order, meaning BorgWarner's assent alone could not consummate a contract. *See id*.

The context of the parties' negotiations also confirmed that the quotation functioned only as the starting point for bargaining. *See id*. Parker's email conveying the quotation invited BorgWarner to review it and discuss questions. Further, the parties continued exchanging communications regarding logistics and scheduling, and BorgWarner did not issue a purchase order until more than two months later. *See id*. These circumstances demonstrated that the parties anticipated further negotiation rather than immediate contractual acceptance. *See id*. Given the

35

indefinite terms and circumstances signaling nonfinality, the Circuit held that Parker's quotation was not an offer under Ohio's UCC statute. *See id.*

Applying those principles here, under Kentucky's like provisions, it is clear CIMCO's Proposal was not an offer.[4] Although the Proposal contains detailed descriptions and prices for Chiller B, the condenser, and the estimated freight cost, its "Commodity Statement" notes the conditional nature of the point-in-time proposal:

> CIMCO Refrigeration proposals are subject to review and *acceptance* at the time of order placement. Should there be any change in material or equipment cost to CIMCO Refrigeration due to metal marker fluctuation, a metal surcharge shall apply to the quoted price. CIMCO Refrigeration will notify you at the time of order placement for your *approval*.

*See* DE 35-2 at 7 (emphases added). These hedging provisions thwart contract formation, even on immediate bid acceptance. Furthermore, the Proposal, in an ALL CAPS introductory header to its appended terms and conditions, plainly indicates that further assent by CIMCO—not merely Smucker's acceptance—was required before the creation of a contract. Above the terms and conditions, the Proposal states:

> SUBJECT TO WRITTEN APPROVAL BY A DULY AUTHORISED OFFICER OF CIMCO REFRIGERATION INC. (THE "VENDOR"), THIS QUOTATION, IF ACCEPTED IN WRITING BY THE PURCHASER, SHALL CONSTITUTE A BINDING CONDITIONAL CONTRACT OF SALE AS OF THE DATE OF THE PURCHASER'S ACCEPTANCE OR AS OF THE DATE OF THE VENDOR'S APPROVAL, WHICHEVER IS LATER. THIS QUOTATION IS INVALID IF NOT ACCEPTED BY THE PURCHASER WITHIN SIXTY DAYS OF THE DATE OF QUOTATION.

*See id.* at 8. Even if Smucker signed the proposal, the deal was still "subject to written approval" by CIMCO and was, in the spongy parlance of the document, a "binding conditional contract of sale[.]" Like Parker's quotation in *BorgWarner*, CIMCO's Proposal, by its verbiage, is subject to

---

[4] Both Kentucky and Ohio have adopted Article II of the UCC. *See Int'l Periodical Distribs. v. Bizmart*, 768 N.E.2d 1167, 1168 (Ohio 2002); *A & A Mech., Inc. v. Thermal Equip. Sales, Inc.*, 998 S.W.2d 505, 509 (Ky. Ct. App. 1999). Kentucky's version of the UCC defines offer and acceptance in KRS § 355.2-206; *see also* § 355.2-204.

change and contingent upon the seller's eventual and later confirmation. These are "telltale signs" that the Proposal was not an offer. *See BorgWarner,* No. 23-3204, 2025 WL 1433918, at *6.

The Court considers, then, whether Purchase Order PO-143323 constituted an offer. Smucker issued to CIMCO Purchase Order PO-143323, certainly responsive to the bid, for $559,388.00 for the purchase of Chiller B. *See* DE 47-2 at 13. Smucker PO-143323 incorporates by reference Smucker's Purchase Order Terms and Conditions ("Smucker T&Cs") via the following language set forth in that Smucker purchase order:

Terms and Conditions

Purchase order and line numbers must be shown on all packages, packing slips, invoices and correspondence.

This purchase order incorporates by reference the Purchase Order Term and Conditions located at www.jmsmucker.com/Legal, which are subject to change from time to time. By accepting this purchase order, Supplier acknowledges it has reviewed and agrees to be bound by the Purchase Order Terms and Conditions.

*See* DE 47-2 at 18. Importantly, the Smucker T&Cs provide,

PURCHASE ORDER TERMS AND CONDITIONS – DIRECT PURCHASES

1. DEFINITIONS. "Smucker" means The J. M. Smucker Company or its designated subsidiary. "Supplier" means the person or entity that receives this Purchase Order from, or fills an order from, Smucker for the sale of Goods (collectively the "Parties"). "Goods" mean the goods and/or services ordered by Smucker or delivered by Supplier to Smucker under this Purchase Order. "Purchase Order" means this purchase order used by Smucker to place an order for Goods with Supplier.

2. ACCEPTANCE OF PURCHASE ORDER. This Purchase Order constitutes Smucker's offer to Supplier and is subject to withdrawal at any time prior to written communication to Smucker of Supplier's acceptance of this Purchase Order. Upon Supplier's acceptance of this Purchase Order or commencement of performance pursuant to this Purchase Order, the terms and conditions set forth herein will constitute the entire agreement relating to the purchase of the Goods. Smucker objects to and specifically rejects any terms and conditions proposed by Supplier which are inconsistent with or in addition to the terms and conditions contained in this Purchase Order. Neither Smucker's subsequent lack of objection to any such terms and conditions, nor the acceptance of goods or services ordered, will constitute agreement by Smucker to any terms proposed by Supplier.

37

*See* DE 47-2 at 83.

Smucker's PO-143323 identifies the vendor corporation and address, the vendor item number for the equipment to be ordered, the quantity and cost of the equipment ordered, the shipping address for the equipment, identification that the freight was "Fully Invoiced," and included the date the goods were expected. *See* DE 47-2 at 13-18. Under Kentucky law, such a purchase order has sufficiently definite terms to constitute an offer. *See A & A Mechanical, Inc.*, 998 S.W.2d at 511; *see also Chrisman Mill Vineyards, Inc. v. Presque Isle Wine Cellars, Inc.*, No. 5:16-CV-190-KKC-EBA, 2018 WL 6380765, at *4 (E.D. Ky. Mar. 19, 2018).

In response to Smucker's PO-143323, on April 16, 2021, CIMCO issued Invoice No. 90765865—which references PO-143323—to Smucker. *See* DE 47-2 at 20. On October 5, 2021, Smucker issued PO-251119 to CIMCO for $409,542.00 for the installation of Chiller B. *See id*. at 22-27. In connection with that purchase order, on December 10, 2021, CIMCO issued Invoice No. 90797335 for $279,694.00 to Smucker for its progress billing in connection with CIMCO's installation of Chiller B. *See id*. at 29. CIMCO then supplied and finally installed Chiller B. *See* DE 47-2 at 7.

In Kentucky, and unless otherwise unambiguously indicated, an offer to make a contract shall be construed as inviting acceptance in any manner and by any reasonable medium. KRS § 355.2-206(1)(a). Further, "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of . . . goods." KRS 355.2-206(1)(b); *see also Home Lumber Co. v. Appalachian Regional Hospitals, Inc.*, 722 S.W.2d 912, 914 (Ky. Ct. App. 1987) (finding acceptance of unsigned Purchase Order when party shipped the goods ordered); s*ee also Mantaline Corp. v. PPG Industries, Inc.*, 225 F.3d 659 (Table), 2000 WL 799337 at *3 (6th Cir. 2000) (finding acceptance

38

of Purchase Order by prompt shipment of the goods ordered under identical Ohio statute).  The Court finds that CIMCO accepted Smucker's offer when it shipped the goods in response to the initiating Purchase Order from Smucker.  Thus, CIMCO's claimed exculpatory provision does not apply, and the contractual terms between the parties do not foreclose Plaintiffs' claims.

A few other important and alternative conclusions also apply.

Even if CIMCO could establish that its proposal at DE 35-2 became the sales contract,  the Court would not apply the exculpatory clause in this dispute, for several reasons.  The relied-on bid simply governed the *sale* of Chiller B.  There was separate documentation for Chiller installation, *see* DE 47-2 at 68, and still separate documentation for a later preventive maintenance/inspection relationship, *see* DE 47-2 at 76.  None of those documents purport to govern the standalone repair call initiated in December of 2022, when the fire occurred.  *See* DE 47-2 at 68; DE 47-2 at 76.  The December call to CIMCO was "an emergency service call visit . . . not part of a quarterly maintenance and inspection visit[.]"  DE 47-2 at ¶ 20.  The parties did not treat that call (or one the next month) as originating from any of the referenced documents.  Indeed, the record is devoid of any contract that defines the terms and conditions for such an emergency service call.  What is clear is that CIMCO recorded the time and intended to bill Smucker for the December trip, just as it billed Smucker for a nearly identical mission in January of 2023.  *See* DE 47-2 Exhibit 7 (billing for January troubleshooting also itemizing December 2022 "work performed" with notation that customer "authorized" billing for enumerated work).  Further, in every contract proposal, CIMCO was careful to specify that a *separate* contract would need to exist for additional goods or services.  *See, e.g.*, DE 35-2 at 6-7 (noting that proposal excluded "installation" and that "Continued services after that time [presumably, the time of the agreement] will require a new agreement"); DE 47-2 at 69 (installation proposal, at 73, again stating that

"Continued services after that time will require a new agreement"); DE 47-2 at 76 (2022 Customer Support agreement, specifying regular on-site and annual inspections and stating: "Any material or work not clearly stated within the scope of work will be the responsibility of the owner" and repeating again that "Continued services after that time will require a new agreement."). The upshot is that, in the Court's view, the December 2022 troubleshooting/repair consultation was not an interaction governed by or treated as within the identified contracting documents. What did govern those actions is unclear, but the proffered exculpatory provisions, from the original Chiller B bid, would not apply.

Finally, even if CIMCO proved that a contract applied, covering Chiller repairs, and that an exculpatory clause figured into such contract, Kentucky law would prohibit operation of the clause to protect CIMCO from its own negligence. Smucker purchased Chiller B to be attached to and integrated within its physical plant environment. Surely a pad-affixed piece of equipment of this scale and centrality to the building would qualify as a fixture and real estate improvement under Kentucky law. See *Southern Industrial, LLC v. Maxine, LLC*, No. 2008-CA-002311-MR, 2009 WL 4060698, *2 (Ky. Ct. App. Nov. 25, 2009) (quoting 36 C.J.S. Fixtures § 1) ("A fixture is an article in the nature of personalty, which has been so annexed or affixed to realty that it is regarded for legal purposes as part of the realty, loses its separate existence, partakes of the legal incidents of the freehold, and belongs to the person owning the land."); KRS § 355.9-102(at). The Chiller addition plainly would be an improvement to the Smucker's structure. KRS 371.180 regulates exculpatory clauses in any "construction services contract." The scope of the term is broad, encompassing a "contract or agreement relating to the . . . repair, addition to, . . . improvement to, or maintenance of any . . . structure . . . or improvement attached to real estate." Kentucky unequivocally states: "Any provision contained in any construction services contract

40

purporting to . . . hold harmless a contractor from that contractor's own negligence or from the negligence of his or her agents, or employees is void and wholly unenforceable."  Thus, if CIMCO's bid (or other forms) containing the exculpatory clause governed the emergency repair call, something this record does not establish, then any effort to exonerate CIMCO for negligence liability based on such an exculpatory clause would fail under this public policy rule.

### ii.  **Causation**

CIMCO next alleges that Plaintiff' negligence claims must also fail, as there is no genuine issue of material fact as to whether CIMCO directly or proximately caused the fire.  *See* DE 35-1 at 16.  To prevail on a negligence claim under Kentucky law, a plaintiff must show "(1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; (3) a causal connection between the defendant's conduct and the plaintiff[']s damages; and (4) damages." *Gonzalez v. Johnson*, 581 S.W.3d 529, 532 (Ky. 2019) (citing *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016)).  Duty is a question of law for the court, while breach and injury generally present questions of fact left to the jury.  *Patton*, 529 S.W.3d at 729 (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003)).  Causation operates as "a mixed question of fact and law."  *Id.*

CIMCO contests causation.  Under Kentucky law, proximate causation consists of two factors:

> Cause-in-fact and legal or consequential causation. Cause-in-fact involves the factual chain of events leading to the injury; whereas, consequential causation concerns the concepts of foreseeability and the public policy consideration on limiting the scope of responsibility for damages. In Kentucky, the cause-in-fact component has been redefined as a "substantial factor" element as expressed in Restatement (Second) of Torts § 431.

*Gonzalez*, 581 S.W.3d at 532 (quoting *Lewis v. B & R Corp.*, 56 S.W.3d 432, 437 (Ky. Ct. App. 2001)).  A defendant's actions constitute a "substantial factor" in causing plaintiff's harm if they have an "appreciable effect" in bringing about the injury at issue.  *See Simons v. Strong*, 978 F. Supp. 2d 779, 787 (E.D. Ky. 2013) (quoting Restatement (Second) Torts § 433).

41

Turning first to the cause-in-fact component, CIMCO argues that there is no "direct, distinct, identifiable nexus" between Byrd's alleged negligence in causing the ammonia leak and the ultimate fire in Roaster 9. *See id.* CIMCO points to evidence that Roaster 9 was already shut down about 30 minutes prior to the shelter-in-place alarm. *See id.* Given that peanut meal buildup or smolder is common as a roaster risk, CIMCO theorizes that the smolder was going to happen regardless of the shelter-in-place alarm and the ammonia leak therefore cannot be linked to the ignition of the fire. *See id.*

Even if there is evidence in the record that Smucker lacked procedures to prevent roaster fires in the case of a shelter-in-place alarm, Plaintiffs have sufficiently alleged from the record that Byrd's negligent conduct—leaving the valve open, which caused the emergency evacuation— appreciably contributed to the unchecked spread of the fire. As long as Byrd's initial negligence is what caused Smucker's employees to abruptly abandon Roaster 9, whether peanut material would have inevitably smoldered is not determinative. The point is that the evacuation interrupted the normal shut-down and monitoring processes, and the resultant fire went unwitnessed, undiagnosed, and unchecked because of personnel displacement. In the classic formulation, the fire event would not have occurred, at least not in the damaging way it did, but-for the leak-induced evacuation. *See Howard v. Spradlin*, 562 S.W.3d 281, 287 (Ky. Ct. App. 2018) (quoting *Patton*, 529 S.W.3d at 730) ("But-for causation requires the existence of a direct, distinct, and identifiable nexus between the defendant's breach of duty (negligence) and the plaintiff's damages such that the event would not have occurred 'but for' the defendant's negligent or wrongful conduct in breach of a duty.").

In next contesting proximate causation, CIMCO argues that the damages caused by the roaster fire in Building 7C were not a "foreseeable consequence" of the ammonia leak in Building

42

9.  *See* DE 35-1 at 19.  CIMCO also notes that Byrd's alleged negligence, at best, merely "furnished the occasion" for the Roaster 9 fire.  *See id*. at 20.

The Kentucky Court of Appeals explained the principle of proximate causation in *Estate of Wheeler v. Veal Realtors & Auctioneers, Inc.*, 997 S.W.2d 497 (Ky. Ct. App. 1999).  There, a driver lost control of his vehicle and struck a tree that was negligently protruding into the roadway.  *See id.* at 498.  After the driver's estate brought suit, the court found a lack of cause because the driver's initial loss of control was unrelated to the tree's negligent placement:

> Proximate cause has also been found to be "that which, in a natural and continual sequence, unbroken by any new, independent cause produces the injury, and without which the injury would not have occurred." *Newton v. Wetherby's Adm'x*, 287 Ky. 400, 153 S.W.2d 947, 949 (Ky. 1941). "When the original negligence is remote and only furnishes the occasion of the injury, it is not the proximate cause thereof." *Peak v. Barlow Homes, Inc.*, 765 S.W.2d 577, 579 (Ky. App. 1988).
> . . .
> [Here], the accident[ ] [was] directly attributable to other negligent acts and [was] not proximately caused by [defendant's negligent conduct]. In other words, the failure to remove the tree did not cause Wheeler's accident, as it would have occurred absent Veal's [negligence]. *Gerebenics v. Gaillard*, 338 S.W.2d 216, 219 (Ky. 1960); *Newton*, 153 S.W.2d at 949.

*Id.* at 498–99 (citations reformatted).

CIMCO analogizes the present matter to such cases, where the causal chain was broken by an unrelated act of negligence by the plaintiff.  *See id.* at 17.  This is not fruitful.  Here, any alleged act of negligence by Smucker occurred following Byrd's initial alleged negligence.  The fact that Smucker could or should have had fire mitigation procedures in place is certainly relevant for determining the correct apportionment of fault, but that does not speak definitively to causation. An apportioning jury, allocating fault among all parties at fault, considers the nature of party conduct and the extent of the causal relation between the conduct and damages.  *See* KRS § 411.182(2).

43

The Court does view the causal question as close, but also reasonably debatable. Byrd, who dealt with ammonia regularly, was required to have fluency with JMS's plans and protocols. *See* DE 47-3 at 42, 43, 55-56. He surely would know or foresee that an ammonia release of the type experienced would create sharp danger and prompt Smucker's shelter-in-place evacuation. Such an emergency, in an operating plant, would cause process interruptions and put the reacting company under the stress of exigency. Smucker's personnel leaving equipment unmonitored plainly is part of the shelter-in-place point—suddenly depart the production floor and assemble at the rendezvous point. The key analytical bridge is the fire risk, and the Court believes, as one reasonable view in Smucker's favor, that CIMCO, servicing a company with an obvious roasting oven component, could reasonably foresee a heightened fire risk from an emergency evacuation like one the gas release catalyzed in December of 2022. A jury may hear the tale, ascribe primary risk awareness to Smucker, and determine that CIMCO should not be assigned any responsibility for the loss. After all, as Morrison notes, Smucker had oven expertise, had maintenance duties, could have evacuated in a more protective or segregated way, and could have assured remote monitoring/fire suppression for the well-known smoldering hazard. However, Kentucky is a comparative fault adherent, and a jury could assign a degree of responsibility to CIMCO, on this record. The proximate cause issue is, as is often true, factually "thorny," and because not just one answer reasonably applies, the jury must determine the cause question. As the Sixth Circuit has observed, in *Thacker v. Ethicon, Inc.*, 47 F.4th 451, 460 (6th Cir. 2022): "Kentucky uses the substantial factor test for proximate causation . . . Because this inquiry involves thorny factual questions, Kentucky courts ordinarily leave questions of proximate causation to a jury." *See also McCoy v. Carter*, 323 S.W.2d 210, 215 (Ky. 1959) (leaving proximate cause question to jury when "cause is open to reasonable difference of opinion").

As a final challenge to causation, CIMCO asserts that Plaintiffs' negligence claims must fail given the absence of expert testimony, for Plaintiffs, on the cause and origin of the Roaster 9 fire. *See* DE 35-1 at 21.

"Legal causation presents a question of law" susceptible to summary judgment only when "there is no dispute about the essential facts and [only] one conclusion may reasonably be drawn from the evidence." *Pathways, Inc.*, 113 S.W.3d at 92 (quoting *McCoy*, 323 S.W.2d at 215). "Therefore, whether a plaintiff's damage was caused by the tort defendant typically 'should be left to the jury to determine.'" *Stathers v. Garrard Cnty. Bd. Of Educ.*, 405 S.W.3d 473, 479 (Ky. Ct. App. 2012) (quoting *Eichstadt v. Underwood*, 337 S.W.2d 684, 686 (Ky. 1960)). "It is not surprising then that, with the exception of medical malpractice cases, [the Kentucky appellate court] could find no Kentucky appellate opinion affirming any grant of summary judgment based on a plaintiff's inability to establish, through expert testimony, the existence of a genuine issue of the material fact—in this case, a genuine issue regarding causation." *Id.* at 479–80.

The Court is confident that "a juror applying his or her own common sense" can assess the fire, including the essentially undisputed ignition theory and the highly disputed responsibility for spread and non-detection. *See Davis, Inc.*, 126 F.4th at 1231; *see also id.* at 1232 ("Because Kentucky courts do not require expert evidence to prove causation—at least outside of a medical-malpractice claim—we see no reason to apply a heightened standard here."). Here, whether Plaintiffs' damage was caused by Byrd's alleged negligence "'should be left to the jury to determine.'" *Stathers*, 405 S.W.3d at 479 (quoting *Eichstadt,* 337 S.W.2d at 686).

### iii. **Negligence Per Se**

Finally, CIMCO contends that Plaintiffs' negligence per se claim fails, as unsupported under Kentucky law, when founded on alleged violations of "certain codes, laws, and standards

45

including, but not limited to, 29 CFR §1910.119, 815 KAR 10:060, ANSI/ASHRAE Standard 15, 2018 NFPA 1, 2015 International Mechanical Code, and 2015 International Fire Code." *See* DE 35-1 at 23 (quoting DE 1-1 at 7).

In 1942, Kentucky codified the common law claim of negligence per se. *See St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534 (Ky. 2011). The statute provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation" even if the violation already incurred a penalty. KRS § 446.070. Negligence per se generally requires numerous elements, derived from the cases. The violated statute or regulation establishes (1) the standard of care, and the violation itself is (2) the breach. *See Alderman v. Bradley*, 957 S.W.2d 264, 267 (Ky. Ct. App. 1997). This does not mean, however, that any person can bring a claim for negligence per se against the violator of any statute. Instead, the plaintiff must be (3) within the class of persons the statute was designed to protect, and (4) the "injury suffered must be an event which the regulation was designed to prevent." *Shrout v. The TFE Grp.*, 161 S.W.3d 351, 355 (Ky. Ct. App. 2005). And of course, the plaintiff must still prove (5) causation and (6) injury. *Stivers v. Ellington,* 140 S.W.3d 599, 601 (Ky. Ct. App. 2004). Finally, when the claim involves an administrative regulation, rather than a statute, two additional requirements apply: The regulation must (7) be consistent with the enabling statute, and (8) must relate to public safety. *See Straub*, 354 S.W.3d at 535.

In Kentucky, negligence per se claims arise only from Kentucky law. *See Gonzalez v. City of Owensboro*, No. 4:14-CV-49-JHM, 2015 WL 4594505, at *8 (W.D. Ky. July 30, 2015) (citing *Young v. Carran*, 289 S.W.3d 586, 589 (Ky. Ct. App. 2009)). This includes Kentucky regulations, which carry the force and effect of statute. *See Stiltner v. Bio-Med. Applications of Ky., Inc.*, No. 16-16-ART, 2016 WL 3249158, at *2 (E.D. Ky. June 10, 2016) ("A negligence per se claim is like

an ordinary negligence claim except that the plaintiff alleges that someone violated a statute or regulation rather than a common-law duty of care." (citation omitted)); *Centre Coll. v. Trzop*, 127 S.W.3d 562 (Ky. 2003) ("In Kentucky, administrative regulations do have the force and effect of law when they have been duly promulgated and are consistent with the enabling legislation." (citation omitted)).  Negligence per se, however, cannot be based on a federal statute or regulation. *See Young*, 289 S.W.3d at 589 (citing *T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006); *Alderman*, 957 S.W.2d at 266-67).  "The Kentucky General Assembly did not intend for KRS 446.070 to embrace the whole of federal laws and the laws of other states and thereby confer a private civil remedy for such a vast array of violations." *Hicks*, 189 S.W.3d at 530.

Two distinct lines of cases have developed, as to regulatory defaults, in the Kentucky negligence per se matrix.  The first line involves plaintiffs that attempted to bring negligence per se claims under a federal law or regulation alone.  *See Hicks,* 189 S.W.3d at 530 (affirming dismissal of negligence per se claim because it was based on federal law); *Young*, 289 S.W.3d at 588-89 (same); *Est. of Poe v. Majeed*, No. 23-142-DLB-CJS, 2024 WL 716057, at *2 (E.D. Ky. Feb. 21, 2024) (dismissing negligence per se claim because plaintiff cited to only a federal regulation).  The second line involves plaintiffs that argued Kentucky law adopted some portion of federal law or regulation, but they did not cite to a sufficiently specific adoption or any adoption at all.  *See Short v. Marvin Keller Trucking, Inc.*, 570 F. Supp. 3d 459, 465-66 (E.D. Ky. 2021) (dismissing negligence per se claim because cited Kentucky statute "adopting" the relevant federal regulation was "broad and vague"); *Tassin v. BNK Transp. Inc.*, No. 3:19-CV-00064, 2019 WL 2271163, at *2 (W.D. Ky. May 28, 2019) (dismissing negligence per se claim because plaintiff did not cite to Kentucky adoption of federal regulation in his complaint).

47

Plaintiffs alleged violations of "29 CFR §1910.119, 815 KAR 10:060, ANSI/ASHRAE Standard 15, 2018 NFPA 1, 2015 International Mechanical Code, and 2015 International Fire Code" in their Complaint. *See* DE 1-1 at 7. The only Kentucky regulation cited is 814 KAR 10:060. 815 KAR. 10:060 adopts the National Fire Protection Association's Uniform Fire Code, known as NFPA 1. Although Plaintiffs failed to cite to Kentucky adoption of 29 CFR §1910.119, ANSI/ASHRAE Standard 15, 2015 International Mechanical Code ("IMC"), and 2015 International Fire Code ("IFC"), in their Complaint, they surmount the burden, in part at least, by specifying an enabling statute in their Summary Judgment Response. *See* DE 57 at 33; *see also Stinnett v. CSX Transp., Inc.*, No. 3:08-cv-86-TBR, 2008 WL 4443096, at *1–2 (W.D. Ky. Sept. 26, 2008) ("The Court finds that Plaintiff has alleged sufficient facts for her entitlement to relief to be plausible on its face. Plaintiff alleges that Defendant's negligence and gross negligence caused a train derailment which spilled toxic chemicals that injured Plaintiff. This is not the sort of speculative pleading forbidden by *Twombly*."). KRS § 198B.040(7) authorizes the Department of Housing, Buildings and Construction "[t]o adopt and promulgate a mandatory uniform state building code, and parts thereof, which shall establish standards for the construction of all buildings, as defined in KRS 198B.010, in the state[.]" 815 KAR § 7:120 appropriately references KRS § 198B.040(7) and, in § 5, incorporates by reference the 2015 International Building Code and the 2018 Kentucky Building Code. The Kentucky Building Code incorporates by reference the 2015 IMC, *see* 2018 Ky. Building Code Ch. 28, §2801, and the 2015 IMC incorporates by reference the 2013 edition of the ASHRAE, standard 15, *see* 2015 IMC § 1101.6.

At this juncture, CIMCO disputes Plaintiffs' characterization as falling within 815 KAR 10:060's protective scope. In general, 815 KAR 10:060 pertains to safety standards for "safety for human life against the exigencies of fire and panic and insuring as far as practicable against fire

48

loss."  Here, Plaintiffs allege that CIMCO violated 815 KAR 10:060 by negligently servicing Chiller B in a manner that resulted in an ammonia leak and thus created a fire hazard.  *See* DE 57 at 31.  This leak, the argument goes, triggered a shelter-in-place alarm, thus creating "Distinct Fire Hazards" under 815 KAR 10:060 § 3(b)(4).  *See id*.  Section 3(b)(4) provides, "If the State Fire Marshal or local fire chief determines that a distinct fire hazard exists, the fire hazard shall be remedied so as to render the property safe."  Plaintiffs fail, in the Court's view, to link any conduct-based standard in the cited regulation to the behavior of CIMCO here—what in the regulation would define a duty that CIMCO faced (and breached) in servicing Smucker that day?[5]

However, 815 KAR 15:025 § 5(6)—enabled by KRS § 236.030—is a different story.  That regulation particularly regulates discharges from pressure vessels, requiring location of, e.g., safety valves, to prevent injurious discharge.  CIMCO argues that this regulation cannot apply given that Plaintiffs' claims relate to property damage and business interruption losses from a fire in a different building than the one housing the refrigeration equipment.  *See* DE 58 at 23.  The regulation, however, is not so narrow.  It broadly protects against "injury to persons and property."  Thus, at this stage, given the plain protective scope of that regulation, the Court will retain the negligence per se claim premised on the particular, cited Kentucky regulation.  The question of causal connection between any breach and the fire loss is the same here as it is on the standard negligence theory.

## IV.     CONCLUSION

For the above reasons, the Court on the specified terms of this Order:

---

[5] The same is true for invocation of the NFPA, IMC, IFC, and ASHRAE 15 standards.  Besides citing the incorporated regulations, Plaintiffs do not point to a particular provision that sets the standard of care for Byrd and CIMCO in the act of Chiller maintenance.  There are ASHRAE (§ 11.1) provisions about prevention of line rupture, but that is not the circumstance here presented.  The Court will not hunt the regulations for applicable arguments.

1. **DENIES** in part and **GRANTS** in part DE 33 (Motion to Exclude Steven A. Sanders)

2. **GRANTS** DE 34 (Motion to Exclude particular testimony of Alejandro L. Jiminez)

3. **DENIES** DE 35 (Motion for Summary Judgment) generally, though **GRANTS** in part as to Plaintiffs' negligence per se claims under 815 KAR 10:060, 2018 NFPA 1, 29 CFR §1910.119, ANSI/ASHRAE Standard 15, 2015 International Mechanical Code, and 2015 International Fire Code;

4. **DENIES** DE 36 (Motion to Exclude Clay M. Kniepmann)

5. **DENIES** DE 37 (Motion to Exclude Delmar "Trey" Morrison)

6. **DENIES** DE 38 (Motion to Exclude Andrew T. Clark)

This the 24th day of March, 2026.

Signed By:

Robert E. Wier

United States District Judge

50